on behalf of Captain Blyther's reorganized editor, I would like to reserve two minutes for rebuttal. Your honors, to begin with, one point I want to make is when I read the BAP opinion, I frankly felt I was in a legal twilight zone. I'm sorry, I'm not hearing you. You were in what? I felt I was in a legal twilight zone. I've had that experience. I understand. Because the BAP characterized our position as saying that the requirement of Section 9.2 of the plan to distribute the litigation proceeds was somehow our position was it was discretionary or permissive. We've never taken that position. We've always said it's a contract. That's the very point here. The plan says that Section 1141 controls the plan, that nothing in the plan shall limit the legal effect of Section 1141. That legal effect is that you have an unconditional and irrevocable contract with the creditors. You have an unconditional and irrevocable discharge. Other than what's provided in the plan, you have an unconditional and irrevocable vesting of assets in the reorganized debtor. The BAP basically interpreted Section 9.2 as having the reorganized debtor hold this That is a limit. That flies in the face of the very terms and conditions of the unlimited effect of Section 1141. Well, then, why did the plan mention this at all? I mean, the plan already said who was going to get paid and what schedule. Generally, because if you do not put in your plan that you reserve the rights that you may have under the Bankruptcy Code and otherwise, there are case law out there that say you lose them. I understand that's why it said that you need to pursue the – that you could pursue the claim, but I don't understand why it said that the proceeds were to be paid to the creditors. Because the plan otherwise said that. If it wasn't something special about this, why was it in there? Generally, it was a boilerplate type of provision that I have put in virtually every plan that I've put in. Because the creditors have an asset here. When we liquidate the asset, we will use those funds to either pay down or pay off the plan. Well, the creditors aren't as well protected if your client controls who he pays as if the court oversees the whole thing, isn't that? That's absolutely right. That's what the plan provides. The judge confirmed the plan. The creditors voted in favor of the plan. It just seems a little counterintuitive if you go from an 11 to a 7, where in the 11, you're structuring your debts and the 7, you're discharging them, that the debtor would suddenly have more control. That's generally what happens in an 11. In an 11, you also get a discharge upon the confirmation of the plan. And the obligation of the debtor in possession, which is a trustee involving a fiduciary obligation, is transformed into a contractual obligation. I've been in front of Judge Newsom, the chief judge of the bankruptcy court, many times and heard him say to people when they're complaining that there may be a default or some other issue with the plan, that once the plan's confirmed, it's a contract. The creditors, if they don't like what happened, can sue in State court. It's a breach of contract. In fact, he doesn't want to hear very much about post-confirmation issues in his bankruptcy court. He tells people, go to State court. You can sue. You can get a judgment. On an 11, though. On a confirmed plan. Once the plan's confirmed, it's a contract with your creditors. And there's a lot of law saying that if there's a breach of the plan, that's a breach of contract, you go to State court, sue. The problem that we have in applying consolidated pioneer, which did not involve a discharge, to this garden variety mainstream Chapter 11 reorganization with a discharge is that it's a backdoor revocation of the plan, a backdoor revocation of the discharge. This court's held in the Orange Tree case that the only way that you can revoke a plan and revoke a discharge is under 1144 of the code. And that's within six months, and that's if and only there's been fraud. This was two and a half years later. The real problem that I think we have is this is a very disturbing precedent. The U.S. trustee now takes the position, in fact, objects to plans of reorganization if it doesn't provide for a revesting of assets upon a post-confirmation default. If I'm a post-confirmation reorganized debtor, I'm going to have a very difficult time borrowing money on a secured or unsecured basis if someone says, how do I know that if you default on your plan and all the assets revest into a Chapter 7 estate, there goes my collateral. If I've loaned you on a secured basis, there go the assets you were going to use to repay my unsecured debt. If that were in the plan directly, however, it couldn't be a problem, could it? In other words, you're saying that this is now going into plans. If it goes into the plan in that form, then presumably, and the U.S. trustee insists on it, that's sort of not the current problem. If the current problem is that it's your argument is that it's not in the plan, but if it were in the plan, how could you complain about it? Are you asking if the – No, you're saying this is a bad precedent because the U.S. trustee is now insisting that this be in the plan. I'm saying if it is in the plan, it can't possibly be objectionable, could it? If it's in the – the problem it presents for reorganized debtors, if you put it in the plan, it hamstrings what's otherwise – I understand, but how could you prevent it? I mean, you could prevent it from being in the plan by not agreeing to it. That's what – But if you do agree to it, there's nothing in this case or this precedent that it really has anything to do with that because – If it's precisely in the plan, then that's – You wouldn't be here, but that's – but you're saying that if we affirm what the BAP has done, then that's what will be happening in the future on a regular basis and that will be bad for Chapter 11 people in general is what you're saying. Let me give you an example. I've been debtors' counsel in 34 Chapter 11s. I had one several years ago that confirmed a plan that said the reorganized debtor will work for the creditors, the unsecured creditors, for whichever happens first, they get 50 cents on the dollar for five years. Four years into the plan, the two owners of the reorganized debtor, which was a corporation, decided to go separate ways. One wanted to retire. The other wanted to move from Oakland to lease property in Richmond. They wanted to sell the property they owned that had been revested in them based on the confirmation order. And the first thing the title company did when they entered into an agreement and opened an escrow is call me and say, well, we need a court order. I said, you don't need a court order. Assets have all been revested under 1141 in the reorganized debtor. The plan was confirmed four years ago. I can't get a court order. That's the position that the judge took in this case with regard to the sale of the restaurant to begin with. You don't need a court order. To some extent, that's correct, yes. And the title company officer said, I don't care what you're saying. Anytime there's a vacancy involved, we need a court order. I said, have your legal department call me. The legal department called me the next day and said the same thing. We need a court order. I said, the case has been closed for four years. They're operating under a plan of reorganization. Here's the legal effect of Section 1141. To make a long story short, it took my unqualified legal opinion that the reorganized debtor had the unfettered ability to sell this property based on the confirmed plan and the provisions of Section 1141, and it took personal identifications from both of the individual owners of the reorganized debtor corporation before they closed the transaction. The question is whether there is something – and I recognize, as you say, that the consolidated pioneer was different because it was a liquidating corporation and that was the entire estate. There was nothing else. And it never did revest in the debtor. That's correct. The question really is whether this particular aspect of the plan, because it specifies at the end of the explanation of the plan, which points to this particular asset as, in some sense, particularly to be distributed to the creditors on a one-to-one basis, apparently, is different. Actually, the plan itself simply says that – The plan itself is general. Yeah, the plan itself in Section 9.2 doesn't particularly specify this litigation. It simply says all claims of the debtor in possession shall be reserved and enforced by the reorganized debtor. Then it says for the benefit of the creditors. Well, what does it mean, then, to say may be enforced for the benefit of creditors? I mean, that's the part that's really mystifying me. I understand any claims in favor of the debtor and debtor in possession, including claims arising under the provisions of the bankruptcy code, shall be fully reserved, period. But then when you go on and say, for the benefit of the creditors in order of priority, it suggests that these claims are for the benefit of creditors and not for the benefit of the reorganized estate. If you look at the brief, I set forth numbers. Based on the numbers involved with respect to the lawsuit, there would have been more than ample funds if the lawsuit were successful to pay off the plan. In addition, at the time that the plan was confirmed – because the way this is written, it says may be enforced for the benefit of creditors, which makes it sound as if the entire corpus is for the benefit of creditors, and I understand that there's been a dispute here about what would happen to any residuum. But certainly this language seems to be saying something other than the reorganized debtor can now enforce the claims as if they were their own. It was, again, a contractual commitment and intended to be a contractual commitment, providing that the reorganized debtor would enforce any claims it had and it would use those proceeds to pay down or pay off any remaining balances if there were any. Okay. You're not only into your reserve time, but you've got over a minute. We'll give you another minute and a rebuttal. Thank you very much. Thank you. Good morning, Your Honors. I'm Daniel Lynch of Goldbergs, Netmeyers & Davis, and I represent Tevis Thompson, Jr., the trustee in the bankruptcy case. Your Honor, I think this has been fairly well briefed. We've got stipulated facts to it. I am, though, a little somewhat concerned about whether a consolidated pioneer can really be transposed to this context, or at least how far does it go. In general, this plan, as I understand it, says that the debtor in possession was to, the estate was to revest and then sets up a payment plan and it says something to the effect of the payments to the holders of all allowed claims will be funded by the earnings and profits of the reorganized debtor. Now, what if, I understand here the restaurant was sold and the only thing that was actually left in the plan with the debtor was this lawsuit. But suppose that weren't so. Suppose the restaurant hadn't been sold and the same thing had happened. Now, on this theory, would the estate, including the restaurant and all of its assets, go back into Chapter 7 and be redistributed to treat it as the prior estate? That would be very odd because, meanwhile, the restaurant had been operating and it was sort of not the same asset that it was when it went into the estate. But yet this language, which says the payments to the holders of all allowed claims will be funded by the earnings and profits of the reorganized debtor, isn't a lot different than the language with regard to the claims. Your Honor, I think the distinction, and again, just to clarify, the issue with regard to the restaurant was raised before we got involved in the case. I understand. I'm just trying to see conceptually where the stopping point is here. I mean, is there something about these claims in this language or would any asset that revested after a plan, which was specified to be used for the benefit of creditors or to pay the payments that were specified in the plan, then revest? Your Honor, I think the answer is that the restaurant, the operating restaurant, would not be property of the Chapter 7 estate. And I think, and we may be splitting hairs here, I think the distinction is that in the language Your Honor just read, it says that the profits and earnings of that operating restaurant are going to be paid to creditors, to use to be paid to creditors. That presumes that there's an operating restaurant and the debtor is operating it. In a Chapter 7, the trustee is not going to operate it. Chapter 7 is a liquidation. The trustee would shut down the restaurant if, in fact, the restaurant were in the Chapter 7. The so I think the distinction is that the operating restaurant does not revest in the Chapter 7 estate, even though in a reorganized setting like that, the business is always operated. All right, but that's not, first of all, the plan does not itself specify this particular lawsuit. It just talks about claims in general. But if we assume that claims means lawsuits, while it's revested in the debtor, things happen. I mean, some of these lawsuits could have been settled. They could have been screwed up. They could have, I mean, they were operated, just like the restaurant was operated. And so what you're revesting really isn't the same thing as came out at the front end, because things happened. And so there's something conceptually strange about this. I mean, the Consolidated Pioneer was a somewhat unique situation, because all the assets of the estate were in a liquidating trust. They were there to be liquidated, and they were not being operated in any sense. I agree that Consolidated Pioneer, the facts are different, but I think the rule of Consolidated Pioneer does apply here. And when you have a provision like the one that deals with the Martinez action, that it's going to be liquidated for the benefit of the creditors. I understand you're saying that, but I need to know where the cutting point is. What makes this different than the restaurant and the hypothetical? Again, it may be. It's not the language particularly, because in both instances, they're talking about doing something, using some asset for the benefit of creditors. One doesn't use the term benefit of creditors, but it's essentially the same idea. And it's not because nothing was going to change in the interim, because in both instances something could have changed in the interim. So what's the difference? One asset is the lawsuit, and the other asset is the restaurant. Your Honor, I think, again, the only difference that I know of is you've got an operating restaurant. And you have to operate a lawsuit, too. The lawsuit doesn't sit around doing nothing. I mean, the lawsuit could have been over. The lawsuit could have been settled. The lawsuit could have been compromised in some way by blowing a deadline. Something could have happened to it. And if that did happen, then there would be nothing to revest in the Chapter 7 of State. But the language with regard to the restaurant presupposes an operation of a restaurant, and that's not what a Chapter 7 trustee does. Go ahead. I'm sorry. Your Honor, the counsel, Mr. Kuhn, had referred to the U.S. trustees' position on other plans. I would just note that the whole issue here can be taken care of in the drafting of the plan and the negotiation with the creditors with regard to that plan. The U.S. trustees are party and interest in the bankruptcy case, but the U.S. trustee does not control the terms of the plan. And, again, I think what Consolidated Pioneer directs and what the BAP, in this case, directed, was that if you're going to have something revest in the Chapter 11 reorganized debtor and not have it revest in a converted Chapter 7 later after the plan has failed, you need to make that explicit in the plan or, more importantly, not identify particular assets as being something that is going to be used specifically for the payment of the creditor. So you think that that's unique to this situation, that because the debtor had made that it was going to be specifically used for the creditors? I do, Your Honor. And I think that's the distinction with regard to a generic plan, where it just says it's going to revest and we're going to go on and operate and we're going to pay creditors out of future operations. And that's because there's a different – it's because for the benefit of creditors? In other words, the notion here is that, in the terms that we were talking about before, that the claims are entirely for the benefit of the creditors so that if there was an overage, the creditors would still get it? No, Your Honor. I don't believe that's the case. I think the creditors are under – like any plan, they're only owed a particular amount. And so that once they're paid in full, the excess would go to the debtor. But the creditors are the initial and primary parties that would get that distribution. I think in terms of this particular case, we can speculate all day as to how much this cause of action may or may not be worth. But the one thing we do know is that any recovery initially goes to the creditors before the debtor gets anything out of it. And you think that that's different, and it may be, that from the payments to the holders of all allowed claims will be funded by the earnings and profits of the reorganized debtor? That's a different concept from shall be fully reserved and may be enforced by the reorganized debtor for the benefit of creditors in order of priority? I think it is, Your Honor. And in that, what's the difference? Again, it is not the restaurant itself that's – it's not a liquidation of the restaurant itself. It's those operations, that bundle of Chapter 11 operations that the debtor is operating. And as a result of the profits that are then realized, that is then used to pay the creditors. That's money in the bank. The question was that in the first instance, it's not the asset itself that's for the benefit of the creditors, but anything it generates. Correct, Your Honor. If it doesn't generate anything, then it doesn't generate anything. Correct. And they may or may not have a failed plan as a result of that. So in this instance, let's say that the U.S. trustee had not come in and tried to convert. Could the creditors – and if the creditors didn't like the way the debtor was pursuing the lawsuit, could they then have come in and claimed a breach of contract? Because he wasn't pursuing it in my benefit, he was screwing it up? I think that would be a tough position to make. I think what the creditors would be able to do, though, is if the plan has failed, if they're doing a breach under the plan, they may be able to come in and pursue it. I'm asking, would that be a breach under the plan? Would it be a breach under the plan if he decided to settle the lawsuit in some way that appeared to benefit him more than it benefited the creditors, for example? I mean, I gather the real fight here. I mean, one question is, what is the real problem here? And I assume the real problem is that if he pursues the lawsuit on his own behalf, he might be more likely, less likely to settle it, more likely to take higher risks and go for a higher amount. That's correct, Your Honor. And if – but the same could have been true just under the plan itself. And my question is, would the creditors have had a contract breach claim if he operated in that fashion? If a settlement was offered, he didn't take it, and the creditors come in and say, but you're not operating for our benefit. You could have paid us off 100% with the settlement. Why didn't you settle? You're breaching the plan. Could they have said that? They must have been able to, or else you wouldn't have been able to convert it because there wouldn't have been a failure of the plan. I think the – It would be hard to prove, but it seems like they could have done that. If what you're saying, the language that initially he was – he was reserving it for the creditors. So if he was acting on his own behalf as opposed to in their interest, it would seem that they might have some – it would be hard to prove. I agree. I think it would be a proof problem, but I think – I believe that the creditors would have standing to pursue some kind of action like that, especially taken to the extreme if he settled it and walked away with the money or something and didn't pay creditors at all. The proof problems, I think, are more delicate if there's an offer on the table and he doesn't settle, and is it a good settlement offer or not. But I think that under the plan, the creditors do have rights along those lines. And here the failure of the plan that was simply not meeting the monthly payments is what the failure of the plan – I mean 5 percent or whatever it was. I believe that was. I think the U.S. trustee made it on that basis. Again, Your Honor, that was before we got involved, but that was my recollection. Thank you very much. Thank you, Your Honors. We'll give you one minute in rebuttal. I have a couple comments to make. Your Honor, again, Mr. Lynch says that you can solve this by drafting around it, basically. That, to me, takes away the effect of the law. You're not supposed to have to put in the plan what the law already provides. Section 1141 is very clear. It provides for unconditional and irrevocable discharge, revesting, and a contract with the creditor. But you're not contesting the conversion itself, as I understand it. We're not contesting the conversion. We're contesting that the problem with the – But you would have a conversion with a zero estate, essentially. Basically, that – well, yes, that's correct. And especially what we're contesting is the effect of a conversion if this springs back into a reconstituted Chapter 7 estate, is that – where it disappeared at confirmation. If it springs back, first of all, that's inconsistent with the unlimited effect of 1141 that's expressly set forth in the plan. And it also revokes the discharge because the Chapter 7 trustee is obligated to distribute assets when liquidated under Section 726 of the Code. And 726 provides different distribution requirements than are provided under the plan. So it's a backdoor revocation of the plan. Two and a half years later, when the only way you can revoke a plan is under 1144. Okay. I mean, frankly, the Lacey court – the district court in Lacey got it right. In the district – in the Lacey case, the bankruptcy judge tried to rewrite the plan to find a trust upon a post-confirmation default. And the district court said, you can't do that. You, in effect, are revoking the discharge. They could have filed a new involuntary Chapter 7, possibly. Say that again? They could possibly have filed a new involuntary Chapter 7. Start it all over again. A new voluntary would be filed against them by – That's what I mean. It was an amount of creditors. That could have happened, absolutely. But it didn't. That's up to the creditors. All right. Thank you very much, Counselor.
judges: Thompson, Berzon, Callahan